**RECEIVED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA    APR 2 1 2008

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

RAYMOND W. STEPHENS        )
                          )
Plaintiff,                 )
                          )
v.                         )        No. 07-0858-HHK
                          )
DEPARTMENT OF LABOR        )
                          )
Defendant.                 )
_____ )

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Raymond Stephens gives the following response to Defendant's Motion for

Summary Judgment and asks the Court to deny it.

## I.    NO IMPORTANT DISAGREEMENTS ON THE HISTORY

I do not have any significant disagreements with the history of this case described in the

Defendant's Motion for Summary Judgment.

## II.    DOL IS ARBITRARY AND CAPRICIOUS IF ITS DECISION DOES NOT
## "MAKE SENSE"

It was easy to look up the Administrative Procedures Act (APA) and find 5 USC sections

702 and 706 which contain the material about standards of review which Defendant's motion

talks about.  I also understand that the law setting up Part E of the EEOICPA says that my denial

under Part E by DOL is reviewable by a court, but only to find out if DOL was "arbitrary and

capricious."  At first, it seemed like DOL had avoided being held accountable even for not

following the law as long as they did it carefully enough.  Then I discovered how easy it was to

look up Supreme Court cases using the Internet alone and I looked at <u>Marsh v. Oregon Natural Res. Council</u> 490 U.S. 360, 378 (1989) which Defendant's quote from in their motion. On page 378 of that case I found the <u>whole statement</u> which Defendant's give only a part of and found it to be much more helpful to my position than just the part they quote. I want to rely on the part that says that a court:

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

I then looked at footnote 23 which is mentioned at the end of page 377 and found additional comments that I want to rely upon. At the end of the footnote it says:

> *See Manasota-88, Inc. v. Thomas, 799 F.2d 687, 692, n. 8 (CA11 1986) ("As a practical matter, . . . the differences between the "reasonableness" and "arbitrary and capricious" standards of review are often difficult to discern"); River Road Alliance, Inc. v. Corps of Engineers of United States Army, 764 F.2d 445, 449 (CA7 1985) ("we are not sure how much if any practical difference there is between "abuse of discretion" and "unreasonable"), cert. denied, 475 U. S. 1055 (1986). Accordingly, our decision today will not require a substantial reworking of long-established NEPA law.*

What I take away from this is a simple idea that "arbitrary and capricious" includes cases of "clear error of judgment" as well as cases of being "unreasonable" and so is not quite as limited as Defendants say it is.

Then on page 11 of Defendant's motion I found a summary of the several pages they wrote about "deferring" to the agency and the "narrow" standard and all that. I was amazed to discover that Defendant itself argued that a simple way to look at "arbitrary and capricious" appears in yet other federal cases and is summed up by saying that

In sum, the agency's decision must "make sense." Young v. General Servs. Admin., 99

FSupp. 2d 59, 66 (D.D.C. 2000).

So, to use Defendant's own criticism from the second paragraph on page 14 of its Motion,

Defendant's argument "almost refutes itself." I will explain below how and why DOL's decision

that LABC was not a DOE facility simply does not "make sense" and is in some ways a "clear

error of judgment" and is "unreasonable" based on information brought to their attention and

what the law actually says.

## III.    THERE IS NO SPECIAL COMPETENCE OF DOL INVOLVED

Defendant's Motion on page 10 suggests that DOL should be deferred to because it has

some special expertise or competence involved in this case. I cannot figure out from the Motion

what particular competence Defendant has in this situation. There does not seem to be any

technical issues which the Department of Labor is expert in. I don't understand what "Labor"

issues are involved. I simply don't see DOL doing anything other than interpreting a special set

of statutes designed to compensate a special group of workers. It does not look like I was denied

Part E coverage for any medical reasons that DOL might have special experience with. It is all

about interpreting definitions in the statutes and rules and using available facts to come to a

decision that makes sense.

## IV.    IF THE DECISION DOES NOT DO WHAT CONGRESS INTENDED,
## IT DOES NOT "MAKE SENSE"

The first thing to think about is what Congress meant to happen based on how they

worded the statutes we are using. Early in this response I quoted 42 USC 7385s-4 paragraph (a)

which says:

> A determination under part B that a Department of Energy contractor employee is entitled to compensation under that part for an occupational illness shall be treated for purposes of this part as a determination that the employee contracted that illness through exposure at a Department of Energy facility.

When I first read this there seemed to be something odd about it. After reading it many times I can now explain why I felt that way, but at the same time I see what Congress was trying to do. The paragraph above is part of 42 USC 7384s-4 which has the title "Determinations regarding contraction of covered illnesses" and paragraphs (b) and (c) talk about workers that were approved under the old Part D (repealed) and then the new cases that do not come from either a Part B approval or an approval under the old Part D. Paragraph (a) above talks about "a Department of Energy contractor employee" who gets approval under Part B because of an illness. It then says that such a worker is to be <u>treated</u> under Part E <u>as if it had been determined</u> that the worker "contracted that illness through exposure at a Department of Energy facility." So that means that Congress wanted <u>at least some</u> Part B successful claimants, perhaps like myself, to automatically be covered under Part E. Since to qualify under Part E it must be determined that you contracted the illness from exposure at a DOE facility, paragraph (a) says that you will be treated as if you did. So far so good.

What is not good about the wording of paragraph (a) is that it appears to apply only to workers who are already a "Department of Energy contractor employee" and the definition for this, given by 42 USC 7384I(11), already requires the worker to have worked at a "DOE facility". "DOE facility" for EEOICPA purposes is defined in the statutes at only one place, 42 USC 7354I(12), and that is the same definition being fought over now. But wait! That means that someone covered by Part B is determined to have contracted their illness through exposure

at a DOE facility only if they already worked at a DOE facility – which goes in a circle at least as far as the DOE facility part is concerned.

Why would Congress want to treat someone as if they worked at a DOE facility only if they already worked at a DOE facility? If you try to save this by focusing on the words "contracted that illness" it still does not make sense. If Congress wanted to extend Part E coverage to the unusual DOE facility worker who actually got sick from exposure off site and still qualified for Part B, it could have addressed this tiny possibility by itself. What paragraph (a) does is address a much larger group, but then does not offer them anything they do not already have.

Just to be thorough, there is one requirement of Part E which paragraph (a) does not automatically give to workers covered by Part B – and who qualify as DOE contract employees. Specifically, 42 USC 7385s (2) defines "covered illness" under Part E as:

(2) The term "covered illness" means an illness or death resulting from exposure to a <u>toxic substance.</u>

Radiation illness, for example, is not covered by Part E at all. Well, if we take away 42 USC 7385s-4(a) nothing changes. The radiation exposure cases don't get Part E coverage either way. In fact, if you take away 42 USC 7385s-4(a) believing it never did extend Part E coverage to workers covered by Part B who did not already work at a DOE facility, then nothing else changes that way either. It cannot be that 42 USC 7385s-4(a) was intended to have no effect on any outcome, so it must be the case that there is a mistake in the way it is worded despite an intent of Congress we can still see.

I cannot find any way to save 42 USC 7385s-4(a) from itself. I can at least say is that Congress obviously wanted to extend Part E coverage to at least some workers who qualified

under Part B who would not otherwise qualify under Part E, but they made some kind of mistake in stating how it should work. In fact, I again say that unless paragraph (a) was intentionally designed to be useless, it must stand for the idea that Congress actually intended that <u>at least some workers</u> not at a DOE facility who qualified for Part B could also qualify for Part E by treating them as if they <u>had</u> worked at a DOE facility. If I can't save 42 USC 7385s-4(a) from whatever mistake was made[1], I can still argue that it was expected to give something to workers they did not already have. That is still a clear enough intent of Congress that other results will not make sense unless they take this into consideration.

### The One Thing 42 USC 7385s-4(a) Stands for Causes DOL's Denial of my Part E claim to not Make Sense

This frustrating study of paragraph (a) affects my case in an interesting way. The way DOL decided that they had to deny my Part E claim was to begin by assuming that there was no way I could qualify for Part E unless I had been employed by somebody to <u>actually</u> work at a DOE facility. DOL does not have room for any exceptions to this requirement. From my study of 42 USC 7385s-4(a) what comes out is that Congress <u>did</u> intend there to be exceptions – even if they made a mistake of some kind trying to define the exceptions themselves. It is impossible to read and study 42 USC 7385s-4(a), (b) and (c) and not accept that Congress meant to extend Part E coverage to some Part B covered workers who would not otherwise have it. Yet DOL ignores this completely and arbitrarily and capriciously concludes that <u>actual employment</u> at a DOE facility – as defined for purposes of EEOICPA – is a requirement with no exceptions.

---

[1] My own opinion is that the phrase "DOE Contractor Employee" in the beginning of paragraph (a) does not belong there at all. Maybe the people who wrote the paragraph meant to put in something else or leave it out entirely. In any case it is impossible to believe that the people writing those words purposely created a situation in which the law gets trapped in a circle because "DOE contractor Employee" requires "DOE facility" in the first place.

## V.    A LOT MAY DEPEND ON ONE PART OF ONE DEFINITION

If I cannot win this case by an argument based on 42 USC 7385s-4(a) by itself, I agree

that much of this case involves carefully reading and making sense of the definition in the law

for what a "DOE Facility" is. The Defendant starts by mentioning 42 USC 7384I(11)(B), which

is part of the picture, but the statute they really meant to refer to is 7384I(12)(B) which is the one

they actually describe. In the DOL rules, 20 CFR 30.5 (w) and (x) say the same things as

7384I(11) and (12) . The statute 42 USC 7384I (12) says that:

> The term "Department of Energy facility" means any building, structure, or premise,
> including the grounds upon which such building, structure, or premise is located—
>> (A) in which operations are, or have been, conducted by, or on behalf of, the Department
>> of Energy (except for buildings, structures, premises, grounds, or operations covered
>> by Executive Order No. 12344, dated February 1, 1982 (42 U.S.C. 7158 note),
>> pertaining to the Naval Nuclear Propulsion Program); and
>> (B) with regard to which the Department of Energy has or had—
>>> (i)    a proprietary interest; or
>>> (ii)   entered into a contract with an entity to provide management and
>>> operation, management and integration, environmental remediation
>>> services, construction, or maintenance services.

On page 12 of their Motion, Defendants agree that in my case, part (A) above "is clearly

met by LABC's Sarasota, Florida facility since beryllium machining took place there on behalf

of DOE." LABC is the short name for my past employer Loral American Beryllium

Corporation.

Since we agree that I qualify under part (A),  the fight is over whether part (B) above is

also met. DOL decided that DOE did not have a "proprietary interest" in the LABC facility so

(B)(i) was not met and Defendant's Motion repeats the argument for that. DOL also decided that

(B)(ii) was not met, but Defendants do not explain this in their Motion. I want to explain below why I think at least one, and probably both, (B)(i) and (B)(ii) do actually apply and that DOL "arbitrarily and capriciously" interpreted them to rule against me even when it had evidence that it "made sense" to recognize LABC as a DOE facility.

## VI.    CONGRESS INTENDED A BROAD DEFINITION OF "DOE FACILITY"

First, I thought about 42 USC 7384I (12) B(i). When I look up in a legal dictionary what "proprietary interest" means I find many possibilities. There seem to be a lot of ways to have a "proprietary interest" in things – even "buildings, structures, or premises". The simplest way is to just own them outright so that you can sell or use them any way you want. From what I can see, however, there are a lot of other ways to take a proprietary interest in a "building, structure, or premise." Just having a possible lien against a property might be an "equitable proprietary interest." Because there are so many possibilities, it seems that Congress had a general idea in mind. It looks to me like the general idea is that if you have a right to some benefit, like income or mineral rights or anything produced by the property, then that right is proprietary. If you have a right to control the use of a property, then your interest might also be proprietary if control or use of the property results in some benefit. When I think of a "proprietor" of a business or enterprise, I think of someone who runs things for their benefit. Anyway, if Congress had some really narrow ideas about what "proprietary interest" they had in mind, they could have said so. The fact that they did not means that they were allowing a lot of possibilities on purpose. Any DOL interpretation that does not accept a lot of possibilities must be one that "arbitrarily and capriciously" picks and chooses the ones it will accept.

Then I thought about 42 USC 7384I (12) B(ii). Now we are talking about entering into a contract with "an entity" to do any of a number of kinds of things. At first I did not understand

the idea behind entering into a contract with "an entity", but then I realized that DOE does not seem to be in the business of doing very much directly. Major companies run its biggest "facilities" so naturally most things done at a "facility" are done by some "entity" which DOE contracts with. I also noticed that there is nothing here that says the "entity" has to be the site itself or the owner of it or the things at the site. It just has to be "an entity" that does certain things at the site that DOE wants done. The statute then goes on to list the kinds of things. I looked at them one at a time:

(1) provide management and operation. (It does not say "total" management or operation.)

(2) [provide] management and integration, (It does not say "total" management or integration. I am not sure what "integration" is supposed to mean and how it is different from "operation", but maybe this is some special term in business.)

(3) [provide] environmental remediation services. (This seems to be a fancy way of saying "toxic cleanup.")

(4) [provide] construction [services]. (At least "construction" is a widely understood term.)

(5) [provide] maintenance services. (It does not say what kind of "maintenance", so even janitorial services and building maintenance should both apply.)

I have already said that the Department of Labor does not have any expertise to be used in this situation. It does not make sense to say that DOL is expert in management of facilities or operating them or doing toxic cleanup or construction or even maintenance. Even if I accept that DOL has been given the power to set up a rules system which creates some way to figure out whether a particular contract meets one of the five kinds of possibilities above, what is still true is that Congress must have expected that list to include a lot of possibilities. If Congress had wanted only a very narrow set of possibilities, it could have had a much shorter list or it could have used much more precise words, or maybe both. So once again, I think the best thing to do

is try and figure out from the list what the general idea is and then look at whether the way DOL looks at it is more narrowly or different from anything listed.

The general idea that I think anybody can come up with from the list of things above is that they are all things which keep a "facility" running in a way that satisfies DOE needs and requirements. Things in the list are all broad, and sometimes very different from each other.

What stands out in this list is that if DOE hires a janitorial service to keep the buildings clean it has the same effect of making it a "DOE facility" as if they had hired the entity to manage the whole show. If DOE hires a company to do construction on the site, it has the same effect of making it a "DOE facility" as would hiring an "entity" to clean up toxic spills. What all these things have in common is that in each case DOE is controlling what and how something at the site is done by hiring "an entity" to do it. It might be a small part or a big part of running the facility, but if DOE contracts with an entity to do it, then DOE has a chance to set standards and control what and how things are done.

## VII.    DOL WAS ARIBITRARY AND CAPRICIOUS IN DECIDING THAT LABC WAS NOT A DOE FACILITY

The administrative record includes a copy of a memorandum from the DOL's Policy Branch Office to the DOL District Director in Jacksonville, FL. (See AR pages 1998 to 2002. A copy of this memo is attached to this Response.)   What that memorandum says is pretty much the position that DOL took in denying my claim. As I look carefully at what the Chief of the Policy Branch says, some of it does not make sense and the result is DOL, of which the Policy Branch is a part, ended up being "arbitrary and capricious" anyway.   In the memo, the Branch Chief quotes from the rule 20 CFR 30.5(x)(1), but this is identical to the statute I quote above, 42 USC 7384I(12).

### What the Policy Branch and DOL's Motion Agrees to

Just as Defendant says in its Motion for Summary Judgment on pages 12-13, the DOL Policy Branch agrees that paragraph A of the 42 USC 7384I(12), which is the essentially the same as 20 CFR 30.5(x)(1) (i), is satisfied. We agree that LABC did work for DOE.

### What the Policy Branch and DOL Do Not Agree to that is Arbitrary and Capricious

#### The available evidences does actually show a DOE proprietary interest

The Policy Branch, and the Defendant in its Motion, then go on to decide that DOE does not have a proprietary interest in LABC's facility. Both explain that I have presented evidence, which they describe, that DOE funded and kept ownership rights to an expensive and delicate machine (a Zeiss UPMC 850) installed at LABC. The Branch Chief argues that ownership in a machine is not the same as proprietary rights in a building, structure, or premise no matter how expensive the machine is. Defendant's motion makes additional arguments along these lines and argues also that just attaching the machine to the floor is not enough to make it part of the building. In the Motion they actually argue that if the machine were to become attached to the soil, then maybe then it would be part of the building and that would then make a proprietary interest in the machine also a proprietary interest in the building – and that would win my case.

#### *Maybe the Zeiss machine was not part of the building, but the DOE funded floor was*

There are three things wrong with the Policy Branc and Defendant's Motion arguments. The first is that in my request for rehearing I introduced evidence that DOE also funded a special floor, which apparently is attached to the soil, for the Zeiss machine to sit on and that is not discussed in the Motion. In DOL's denial of my Part E claim (AR 813-814) they acknowledge

that I submitted this evidence, but do not say that they thought about it at all. It appears that they "arbitrarily and capriciously" ignored that evidence.

### If You have to use State Law to Defend the Decision, then the decision "arbitrarily and capriciously" depends on what State the facility is in.

The second one took me awhile to see, but has to do with how Defendant's Motion uses Florida real estate law to argue that attachment to the soil is needed to make an interest in the machine a proprietary interest in the property.

We are discussing Federal laws and rules that should apply the same to all nuclear workers across the country. The EEOICPA was enacted because there was no uniform program to compensate sick workers all across the country. If DOL has to look at the law of a particular State to decide if an interest is proprietary, then that means the result could depend on what State a worker was employed in. That means that the result depends in an "arbitrary and capricious" way on where the worker lived and worked. That destroys the uniform application of the law across the nation – and that does not make sense.

### Funding Construction of a facility that produces something desired creates a proprietary interest in the facility

The third thing wrong also took me awhile to see, but occurred to me when I read an online article on the meaning of "proprietary interest." Now, along with already having presented evidence that DOE funded a special floor in a building, I have attached to this response a sworn statement by the former president of LABC, George Allen, which summarizes all of the evidence which I already provided and adds to it to say that DOE "required and funded LABC's construction of a separate facility on the grounds of the LABC Tallevast site." (see item 19 page 6 of Mr. Allen's Declaration) I worked at the Tallevast site. Mr. Allen goes on to say that "This

new facility was used exclusively for highly classified "Q Work" ..."    The expression "Q Work"
refers to DOE "Q" clearance.  Only DOE issues Q clearances – the equivalent Department of
Defense clearance is "Top Secret."

Mr. Allen's sworn statement was not available to me until just recently because it showed
up in a recent case in the Federal District Court in Tampa, Florida, that involved cleanup at the
Tallevast site. (see the case name and number at the top – it was docket item 24 in that case.)
Even if I cannot use it to say directly that DOL should have considered it, I think I can still use it
in this Response in two ways. First, it is a sworn statement, from someone who should know,
that demonstrates that my conclusions from the evidence I did provide to DOL about DOE's
involvement with the site are reasonable and defensible. Second, it focuses on a fact appearing
in evidence already provided. Namely the "Q" aspect of the relationship between DOE and
LABC. I will come back to the "Q" argument below. For now I just want to focus on the idea
that the floor and any other construction activity George Allen's sworn statement refers to is just
that – construction activity. The fact that there was any construction activity for DOE's benefit
has two effects and right now I only need to focus on one of them.

Defendant's own Motion for Summary Judgment seems to argue that if DOE invested in
a building or anything "attached to the soil" of the facility, then it would have a proprietary
interest in that. My understanding of "proprietary interest" also includes the general idea that the
right to receive the benefits from the property, like income or minerals, means that the right is
"proprietary." In this case we are talking about DOE funding construction improvements at the
LABC site in order to obtain from it something that DOE wanted – the Q-classified weapons
parts that could then be manufactured there. For DOE, getting the weapons parts it wanted is no
different from an investor getting dividends, rent, or some other financial benefit. If an investor

buys mineral rights of a property they have a proprietary right because they get the minerals the land produces. It seems to me that from DOE's viewpoint, classified weapons parts received from the LABC facility are the "minerals" of that facility and are the valuable benefits that can come from the facility.

Since DOE funded construction at the LABC Tallevast site, it makes sense that it also had the ability to enforce some kind of lien and that too may be a form of proprietary interest. Suppose that right after some DOE-funded construction, say the building of the special floor for that Zeiss machine, that LABC were to have gotten into financial trouble and all kinds of people were foreclosing on them. In that case, DOE could have stepped in and said: "before you start selling off their property, pay attention to the fact that we funded some of that and have not been compensated for that and we have an interest that creates a lien and we want our investment to be paid back before we give it up." This makes sense to me and it looks like a kind of proprietary interest they at least "had" for awhile.

The available evidence does show that DOE contracted with "an entity" in a way that makes the LABC site at Tallevast a DOE facility in the way that Congress intended for EEOICPA purposes.

Above I have referred to a memorandum from the DOL Policy Branch's office to the Director of the Jacksonville DOL District Office – also attached as Exhibit 1. On the fifth page of that memorandum, the Branch Chief brings up EEOICPA Bulletin 03-27. He uses it to support his argument against a requests I made to DOL to find that the LABC Tallevast site was a DOE facility. He refers to paragraph 21 of the Bulletin which is a step in instructions to claims examiners for establishing whether a worker was on the premises of a "designated DOE facility" within a time frame that would make them a covered worker under the EEOICPA.

There is something very arbitrary and capricious about using Bulletin 03-27 in this way and yet there is also something very useful about another part of the bulletin which the Branch Chief does not talk about.

First off, the way the Policy Branch Chief uses Bulletin 03-27 does not make sense. He is trying to argue that DOL cannot find LABC's site to be a DOE facility and he is focusing on a theory which I suggested about LABC being a subcontractor to the DOE Rocky Flats plant. I think we both got somewhat lost, but the point now is that paragraph 21 of the Bulletin just doesn't address the question of whether 42 USC 7384I(12)B can be used to find that that LABC was a DOE site in the first place. It has to do with "designated DOE facilities".

I think its more important to notice what the Branch Chief is arguing in general. What his memo says is that he doesn't think that DOE contracted with LABC in particular and that none of the many documents provided to him showed existence of the kind of contract he believes that 42 USC 7394I(12)B(ii) refers to.

He is just plain wrong to worry about whether DOE ever contracted directly with LABC. What the statute says is that DOE needs only to contract with "an entity" to perform certain kinds of services, but there is nothing in the statute which says that the contracts referred to must be between DOE and an entity that owns the site. This might be a case of "clear error in judgment" and is therefore "arbitrary and capricious." Of course the Branch Chief had a lot on his mind and maybe his judgment was not so bad, but the result still is that he "arbitrarily and capriciously" decided that "an entity" had to be a particular one in this case and there is nothing in the stature that says this is the right way to look at.

One of the documents attached to my Complaint and referred to in the Policy Branch Chief's memorandum is a letter from EG&G Rocky Flats to the Director of Safeguards and

Security for DOE, RFO. (The letter is at page 677 in the AR) RFO stands for Rocky Flats

Office and it is important to note that DOE sets up offices close to major DOE facilities. For

example, in Los Alamos there is LASO which is the Los Alamos Site Office of DOE. The RFO

and LASO are actual offices of DOE, not just some place within a DOE facility. What the letter

reports is that EG&G, clearly acting for DOE, visited the LABC Tallevast site to do an

inspection related to "terminating" LABC as an "active, classified (off-site) subcontractor." Of

course, this means that LABC was, before then, an "active, classified (off-site) subcontractor." I

have submitted many documents, and thePolicy Branch Chief's memorandum refers to them,

that show that LABC was a subcontractor of DOE contractors – principally EG&G and Rockwell

International. If, however, all we are interested in now is whether LABC Tallevast was a "DOE

facility" in the sense of EEOICPA and as defined by 42 USC 7384I(12)B(ii), then its

subcontractor relation to anybody is not important. The only thing that is important is whether

DOE contracted with "an entity" to perform certain kinds of services.

The Branch Chief looked at the documents I had given DOL, and possibly some he found

on his own, and did not find any he thought represented the kinds of services described in 42

USC 7384I(12)B(ii).  It seems like he was hoping to find documents that had clear titles on them

like "Management and Operations Contract" or "Management and Integration Contract" or other

things listed in the statute. That is not required and it is not likely in this situation.

Among the reasons it is not likely is that we now know that LABC was a "classified"

subcontractor. What exactly it did and what exactly DOE did to make sure it was a secure

facility that could do classified work is not necessarily going to be documented other than in a

classified way. Fortunately this does not mean that I or DOL had to have access to classified

material to figure out LABC's status as a DOE facility under the statute.

The reason we do not have to resort to classified material is that the evidence in front of DOL, and the Policy Branch in particular, shows that DOE contracted with EG&G and Rockwell to "manage and operate" or perhaps "manage and integrate" LABC's compliance with DOE Q security requirements. That is, of course, consistent with the sworn Declaration of LABC's past president. George Allen. Again, it is not necessary that DOL had seen such a sworn statement from Mr. Allen. I am only claiming that Allen's sworn statement supports my own interpretation of what DOE's relationship with LABC was even before I knew George Allen would swear to it.

Now we can put it all together in a clear way. Here are the reasons why 42 USC 7384I(12)B(ii) is satisfied and LABC is therefore a DOE Facility for purposes of EEOICPA:

(1) EG&G and Rockwell were already contractors of DOE. DOE contracted with them to perform the "management and operation" and/or the "management and integration" services of setting up and supervising, LABC's compliance with DOE security requirements. This was done in order that classified work be performed by LABC for DOE. DOE used its existing contractors to carry out this mission, and the documents show that these contractors reported back to DOE directly. All that means is that DOE indeed contracted with "an entity" to do these things at the site. The documentation in the AR has all kinds of references to this activity including visits to LABC of DOE inspectors from the nearby Pinellis DOE facility. For a time, the LABC Tallevast facility met the requirements of the EEOICPA statutes to be a DOE facility.

(2) Rockwell in particular had much to do with buildout involved with a particular part of the LABC Tallevast site that included installation of the Zeiss machine. This certainly included building a special floor – attached to the soil! But the documents, corroborated by George Allen's attached sworn statement, support the interpretation of previously supplied evidence,

that DOE funded the construction activity associated with allowing LABC Tallevast to become a Q "classified" facility. Somebody did all that construction, but did DOE contract with "them"? Well, maybe LABC itself did the construction in the sense of acting as its own general contractor. If so then they did so at the request of DOE as delivered by Rockwell who was acting as an agent of DOE. The EEOICPA is not concerned with the fine details of such arrangements and the wide reach of 42 USC 7384I(12)B(ii) should not be "arbitrarily and capriciously" limited by requiring that the i's b dotted and the t's crossed in some arbitrary way. The bottom line is that DOE paid for, one way or another, the construction and either had a contractual relation with LABC itself or somebody else to make sure it got done according to their requirements.

(3) Finally, I can bet back to Bulletin 03-27. That bulletin states a DOL definition of "contract" in this very kind of situation. It defines it this way:

> **Contract** – An agreement to perform a service in exchange for compensation, usually memorialized by a memorandum of understanding, a cooperative agreement, an actual written contract, <u>or any form of written or implied agreement</u>, is considered a contract for the purpose of determining whether an entity is a "DOE contractor."

I underlined what I think is particularly important in that definition. What is important about this definition in DOL's own bulletin, which the DOL Policy Branch Chief himself brought to our attention, is that "any form of written or <u>implied agreement</u>, is considered a contract for the purpose of determining whether an entity is a 'DOE contractor'." So, LABC or Rockwell or EG&G, by agreeing to get the construction done or supervising the security at the LABC Tallevast site, can be found to be "an entity" which DOE contracted with even if

the DOL Policy Branch Chief never finds a document describing this agreement in clear terms. All he ever needed was the evidence tht DOE wanted things done and the fact that it did get done and the fact that it involved managing and operating some part of the LABC operation, or managing and integrating some part of it, or even just carrying out construction as DOE required. DOE was involved in activities of the kind listed in 42 USC 7384I(12)B(ii) and DOE contracted with "an entity" to get them done – and that is all the stature requires in order for LABC to be considered a DOE facility for purposes of EEOICPA alone.

## VIII.   CONCLUSION

I have explained:

1.  the statutory reason for believing that Congress intended that my approval as a Part B claimant automatically results in my approval as a Part E claimant, and

2.  reasons why Congress intended that LABC's Tallevast site should be a DOE facility for purposes of EEOICPA  which results in my qualifying for Part E benefits.

I have also explained that DOL's denial of my Part E claim involves being arbitrary and capricious in the sense that the US Supreme Court believes that standard should be applied.

I ask the Court to deny Defendant's Motion for Summary Judgment. I will follow the local rules and ask the Court to allow me to amend my own Motion for Summary Judgment or renew it to include the arguments and exhibits presented in this Response – and, of course, I accept that the Defendant will be given time to respond to the amended Motion.



Respectfully,


Raymond Stephens, pro se

A proposed Order Denying Defendant's Motion for Summary Judgment is attached.

### Certificate of Service

I certify that a true copy of this Response has been ~~faxed~~ *Pa S* to Attorneys for the Defendant, below,
*Fed 6X*
on this 18th day of April, 2008.

JEFFREY A. TAYLOR
United States Attorney

RUDOLPH CONTRERAS
Assistant United States Attorney

CLAIRE WHITAKER
Assistant United States Attorney

United States Attorneys Office
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137
Fax: (202) 514-8780

By
Raymond Stephens

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RAYMOND W. STEPHENS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-0858-HHK |
| | ) | |
| DEPARTMENT OF LABOR | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
## REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Raymond Stephens hereby submits his list of facts not in dispute with respect to his Response opposing Defendant's Motion for Summary Judgment.

### I.  FACTS WHICH DEFENDANT SUBMITTED WHICH ARE
### IN FACT DISPUTED BY PLAINTIFF

**# 4 by Defendant**

In item 4 they say inside parenthesis that Part E of the EEOICPA does not apply to "employees of beryllium vendors or AWE's." I agree that to be covered under Part E there seems to be a requirement that the worker worked at a DOE facility, but there is no reason why a worker could not have worked for a a beryllium vendor or AWE who was also operating at a DOE facility so that the worker would qualify under Part B and part E at the same time. In fact, section 7385s-4 paragraph (a) says specifically that A determination under part B that a Department of Energy contractor employee is entitled to compensation under that part for an occupational illness shall be treated for purposes of this part as a determination that the employee contracted that illness through exposure at a Department of Energy facility.What this says to me

is that Congress intended that a worker was entitled to compensation under both Part B and Part E in some situations.  In Paragraph 7, Defendants themselves actually say that "A beryllium vendor facility may also be a "DOE facility.

**# 6 by Defendants**

I do not agree with Defendant's statement that "The determination of whether a particular "building, structure, or premise" is a "DOE facility" has been left to the discretion of the Director of the Office of Workers' Compensation Programs ("OWCP") within DOL. 20 C.F.R. § 30.5(x)(1) (2006)."  I cannot find anything in the statutes (42 USC sections 7384 and 7485) which actually says that. The C.F.R. which Defendant gives is a rule written by DOL.  That says to me that DOL gave itself the authority.  That seems to me to say that they decided on their own that they can decide this any way they want to.  That sounds to me like they can be "arbitrary and capricious" and make up their own rules whenever they want to.  I can understand that they have authority to create rules to make the whole process consistent and orderly, but what Defense counsel is saying is that they can decide any time what a DOE facility is or is not using ideas not in written rules.  I cannot find a statute that says this.

**# 8 by Defendant**

In item 8 Defendant says that I "bore the burden of proving by a preponderance of the evidence the existence of each and every criterion necessary to establish eligibility" and they mention three rules: 20 C.F.R. sect 30.100, 30.101 and 30.110(c).  Again I see that DOL has made up a rule on its own.  In the statutes I can only find one standard of proof for anything –

2

that being "at least as likely as not". This looks like DOL creating a higher standard of proof in some part of the process than the standard stated in the law. I am not a legal scholar, but this does not seem right to me. If they can make up rules on their own about how strict to be, or ask a worker to be, then what keeps them from being "arbitrary or capricious" about how strict they want to be about anything?

**#9 by Defendant**

In item 9 Defendant attempts to summarize what EEOICPA claims I filed and what the results were. To the best of my knowledge and belief, one detail stated in this item is not correct. My understanding is that when I filed the Part E claim I did not limit it specifically to heart and lung problems, but intended to seek coverage of all possible conditions that resulted from my exposure. As I understand it, the Part E process evaluates all consequences of exposure to toxic substances even if some of them are already covered by Part B. The Medical coverage would be the same in any case, but the Wage Loss and Whole Body Impairment benefits would stand on their own independent of whether there had previously been a Part B award.

## II. FACTS SUBMITTED BY DEFENDANT OTHERWISE AGREED TO

Except for the exceptions and objections above, Plaintiff otherwise adopts Defendant's Statement of Material Facts Not in Dispute.

Respectfully,

/ Raymond Stephens, pro se

3



800S | S 8MA

## Certificate of Service

I certify that a true copy of this Statement of Undisputed Facts  has been ~~faxed~~ *KWS* / *FedEx* to Attorneys for

the Defendant, below, on this 18th day of April, 2008.

JEFFREY A. TAYLOR
United States Attorney

RUDOLPH CONTRERAS
Assistant United States Attorney

CLAIRE WHITAKER
Assistant United States Attorney

United States Attorneys Office
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137
Fax: (202) 514-8780

By _____

4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAYMOND W. STEPHENS                         )
                                            )
Plaintiff,                                  )
                                            )
v.                                          )
                                            )          No. 07-0858-HHK
DEPARTMENT OF LABOR                         )
                                            )
Defendant.                                  )
_____             )

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant having filed a Motion for Summary Judgment in this matter and Defendant having filed a Response thereto, the Court, upon considering the written motions and response and otherwise being fully advised in the premises,  hereby finds that said Motion for Summary Judgment should be, and the same is hereby, Denied.

DONE AND ORDERD this _____ day of _____, 2008

_____
Hon.  Henry H. Kennedy, Jr.,

U.S. Department of Labor

**MEMORANDUM**

Date:

SEP 2 5 2006

Exhibit 1  page 1 of 5

Plaintiff's  Response Opposing
Defendants Motion for Summary
Judgment

To        Bill Franson
          District Director
          Jacksonville District Office

From:     John Vance
          Branch Chief
          Branch of Policy, Regulation and Procedures

Re:       American Beryllium Company

On May 31, 2006, the Division of Energy Employees Occupational Illness
Compensation (DEEOIC) received a request to consider whether the
American Beryllium Company, (ABC) in Sarasota, FL should be listed as a
Department of Energy (DOE) facility or alternatively, whether it should be
considered an EEOICPA-covered subcontractor to the DOE Rocky Flats
Plant. ABC is currently a designated beryllium vendor under the Act for
1967-1992. This request was forwarded to the Branch of Policies,
Regulations, and Procedures (BPRP) for evaluation.

On June 5, 2006, the Jacksonville Final Adjudication Branch received a
letter from the claimant, Mr. Raymond Stephens, in which he stated that
the Department of Energy (DOE) located "thousands of pages of
documents revealing that Loral American Beryllium did far more work on
DOE projects than originally believed." Mr. Stephens requested that these
additional records be examined in making the determination whether the
ABC meets the definition of a DOE facility. The DOE has provided a copy
of these additional documents to the BPRP on a CD. There are 1063
imaged pages on the CD, though not all are pertinent to ABC (some
documents pertain to other corporate entities).

ABC was purchased by Loral Corporation and became Loral American
Beryllium, and the names are used interchangeably in this memorandum.
In addition, some documents reviewed contain a Sarasota, Florida address

for the plant while others have a Tallevast address. Regardless of how it is characterized, the documentation all pertains to the same plant.

On August 22, 2006, Mr. Stephens submitted additional documents to the BPRP. These documents are summarized as follows:

Documents #1 and #2 are correspondence between Loral American Beryllium and Rockwell International (Rockwell), the contractor for the DOE's Rocky Flats Plant. These letters discuss the purchase of an "Aqueous Cleaning System" by Loral, and the company's recovery of its costs in that acquisition by means of a surcharge on parts sold to Rockwell.

Document #3 is a requisition whereby some equipment was transported to Speedring (another EEOICPA-designated beryllium vendor) Culman, Alabama from Loral American Beryllium.

Exhibit 1  page 12 of 5

Plaintiff's Response Opposing Defendants Motion for Summary Judgment

Document #4 is an internal Rocky Flats letter dated November [...] which procedures for procuring beryllium parts from ABC and [...] These procedures included having ABC make the tooling and gaging necessary for the manufacturing and inspection of parts. Mr. Stephens highlighted the sentence, "The team also agreed that certified fixturing used in lieu of inspection gaging would become the property of Rocky Flats." ABC is referred to throughout the letter as the "vendor."

Document #5 is a portion of a Rocky Flats letter dated May 9, 1991, discussing security clearance termination procedures for ABC, referred to as an "off-site classified subcontractor" when Rocky Flats stopped procuring parts from ABC.

Document #6 is a Rocky Flats letter dated June 11, 1991, containing the statement, "Effective this date, EG&G Safeguards and Security records will reflect that Loral ABC is no longer considered an active, classified (off-site) subcontractor."

Document #7 is a letter dated July 25, 1985 in which Rockwell authorized Loral American Beryllium to purchase on Rockwell's behalf a "Zeiss UPMC 850/1200 Measuring System." The letter provided that Rockwell would advance $434.937 to pay for the equipment, with ownership vesting in the government.

Documents #8 & #9 provide more information about the Zeiss machine, including indications that Rockwell inspected it and calibrated it.

Document #10 is a December 5, 1985 letter in which Rockwell authorized payment of Loral American Beryllium's costs in shipping classified materials, for its contracts with Rockwell, from the Pinellas facility (a DOE facility in Clearwater, Fl).

In making a determination on this matter, the BPRP has carefully reviewed all the material in the file as well as all the additional documentation from Mr. Stephens and the DOE.

In considering the question of whether the reviewed evidence supports a finding that the American Beryllium Company is a DOE facility under the Act, the applicable law and regulations are:

20 C.F.R. § 30.5 (x)(1)(2005) contains the current regulatory definition of "Department of Energy facility" and states:

> Department of Energy facility means, as determined by the Director of OWCP, any building, structure, or premise, including the grounds upon which such building, structure, or premise is located:
> (i) In which operations are, or have been, conducted by, or on behalf of, the DOE (except for buildings, structures, premises, grounds, or operations covered by E.O. 12344, dated February 1, 1982 [42 U.S.C. 7158 note], pertaining to the Naval Nuclear Propulsion Program); and
> (ii) With regard to which the DOE has or had:
> (A) A proprietary interest; or
> (B) Entered into a contract with an entity to provide management and operation, management and integration, environmental remediation services, construction, or maintenance services.

Assuming that the machining of parts by ABC does constitute "operations" and thus fulfills (i) of the definitional test, one is left to find that DOE had either:

> (A) a proprietary interest; **or**
> (B) Entered into a contract with an entity to provide management and operation, management and integration, environmental remediation services, construction, or maintenance services.

Exhibit 1  page 3 of 5

Plaintiff's  Response Opposing Defendants Motion for Summary Judgment

In terms of proprietary interest, the documentation reviewed suggests that the following items were either owned or potentially owned by DOE:

- Zeiss machine[1] (DOE owned);
- "certified fixturing used in lieu of inspection gaging," and
- potentially the "Aqueous Cleaning System."

None of these items alone or in combination with one another is sufficient to be considered the proprietary interest of DOE. Proprietary interest needs to be buildings, structures, or premises. Equipment, no matter how large, special-purpose, unique or expensive, is still just equipment; it is not sufficient to be considered a proprietary interest under (A) of the definition of a DOE facility.

With regard to determining whether prong (B) of the test is met, our office reviewed each of the documents in the file to see if any were a management and operation, management and integration, environmental remediation, construction or maintenance contract. These are the types contracts that are common at the large DOE facilities and which are specified in the law. The file contains none of the specified contracts and no evidence that such a contract ever existed between ABC and the DOE or its predecessor agencies. The files are overwhelmingly comprised of purchase orders for parts as well as letters and memoranda regarding arrangements, specifications, vendor audits, quality assurance and delivery of those parts.

In addition to purchase orders, pp. 766-768 of the material provided by the DOE is a Rockwell memorandum dated June 6, 1988, discussing procurement from ABC. It refers to the procurement relationship between Loral and Rockwell in the following manner:

> Nine beryllium component types for the B83 Program have been fabricated by Loral ABC in Tallevast, Florida since the early 1980's and will terminate at the completion of the current contract on June 30, 1988. The fabrication contract for FY89-FY91 deliveries have been awarded to the RADG/Speedring after analysis of a competitive bid to provide machining.

The June 8, 1988 memorandum includes an attachment with a chart on parts pricing.

---

[1] A photograph of a Zeiss machine was located on the internet and add[...] nature of a Ziess machine.

Exhibit 1  page 4 of 5

Plaintiff's  Response Opposing Defendants Motion for Summary Judgment

Another document (pp. 810-813) forwarded by the DOE and dated
September 30, 1987 provides additional details on the nature of the
relationship between Loral ABC and the DOE. The attachment gives the
delivery schedule for parts being sent from Loral ABC to the DOE. The
delivery is identified in the schedule by a separate purchase order
number. This suggests that the fabrication contract was basically
implemented through purchase orders. This is confirmed by a statement
in an October 7, 1983 Quality Engineering Report that "Loral American
Beryllium Company (LABC) of Tallevast, Florida machines and inspects
products for [Rockwell] under purchase order contracts."

Exhibit 1  page 5 of 5

Plaintiff's Response Opposing
Defendants Motion for
Summary Judgment

Irrespective of whether the contracting mechanism was a fabrication
contract, purchase orders or some combination thereof, none of these
procurement mechanisms meets the legal test outlined in (B).   Review of
all the documentation clearly shows that the role of Loral American
Beryllium in relation to the various portions of the AEC and DOE with
which it did business was that of a vendor. ABC was in fact referred to as
a "vendor" throughout the November 12, 1981 internal Rockwell letter.
ABC therefore does not meet the statutory definition of a DOE facility.

Mr. Stephens also requests that BPRP consider whether ABC qualifies as
an EEOICPA-covered subcontractor to the DOE Rocky Flats Plant. The
Rocky Flats Plant is a DOE facility. Fed. R. Vol. 70, No. 109, p. 33610.   He
argues that since ABC manufactured parts under contract for Rocky Flats,
ABC employees should be covered under Part E as DOE contractor
employees. Mr. Stephens also highlights the sentence in document #6
stating, "Effective this date, EG&G Safeguards and Security records will
reflect that Loral ABC is no longer considered an active, classified (off-site)
subcontractor."

Regardless of how ABC was characterized in correspondence from
Rockwell, however, under the EEOICPA, subcontractor employment for a
DOE facility can only be established if such employment took place *on the
premises* of a designated DOE facility. See EEOICPA Bulletin No. 03-27 –
paragraph 21. Therefore, because the parts ABC manufactured for Rocky
Flats were made in Sarasota and not at Rocky Flats, ABC cannot be
considered a subcontractor of a DOE facility for purposes of the
EEOICPA.

Given these facts, Loral American Beryllium, also known as American
Beryllium Company, has not met the definition of a DOE facility under
the EEOICPA.  The facts also do not support a finding of an EEOICPA-
covered subcontractor relationship for ABC.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| LAURA A. WARD, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>LOCKHEED MARTIN CORPORATION, )<br>LORAL CORPORATION, WPI SARASOTA )<br>DIVISION, INC., WIRE PRO, INC., )<br>BECSD, LLC,  and DOES 1-20, )<br><br>Defendants. ) | Civil Action No.<br>8:05-CV-1878-17-TGW |

## DECLARATION OF GEORGE M. ALLEN JR IN SUPPORT OF LOCKHEED MARTIN CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

I, GEORGE M. ALLEN, JR declare as follows:

1.      Based upon my education and experience as a former employee and officer at

Loral American Beryllium Company ("LABC"), detailed below, and based upon corporate

records of LABC, I have knowledge of the facts stated herein and, if called as a witness, could

and would competently testify thereto.

**Experience**

2.      I received a Bachelor of Science degree in Industrial Engineering from the

University of Florida in 1953.  After graduation, I served as a pilot for the United States Air

Force from 1953 to 1958.  After leaving the armed forces, I served as the President of the

Aero Precision Company, a general machining company in St. Petersburg, Florida.

Exhibit 2  page 1 of 8

Plaintiff's Response opposing Defendant's
Motion for Summary Judgment

3.    In 1961, I left the Aero Precision Company to work as a Senior Subcontract Engineer for the Honeywell Corporation in Clearwater, Florida. My duties included working with beryllium machining companies, such as the American Beryllium Company ("ABC"), to aid them in the performance of their subcontracts with Honeywell.

4.    In 1964, the Loral American Beryllium Company ("LABC") hired me as a salesman in its Sales & Marketing Division. In the early 1970s, I was promoted to Vice President of Sales & Marketing. In the late 1980's, I was promoted to President of LABC and held that position until 1995.

5.    In 1995, I left LABC to work for its parent company, Loral Corporation ("Loral Corp."). My responsibilities at Loral Corp. included advising Loral Corp. during its acquisition by the Lockheed Martin Corporation. From 1995 to 1997, I also served as President of Beryllium Materials International, a joint venture between Loral Corp. and a Russian company that supplied raw beryllium materials.

**History Of Loral American Beryllium Company**

6.    ABC originally began operating as Visioneering, a general metal machining company, in the 1940's. In the late 1950's, however, the company changed its name to the American Beryllium Company and focused on machining beryllium components, in response to the United States government's growing demand for precision machined beryllium.

7.    Beryllium is a naturally occurring elemental metal that is mined out of the earth. Beryllium has a high vertical and horizontal tensile strength that makes it stronger than steel. (*See* Local Plant Machines The Mercedes of Metals, The Miami Herald, attached as Exhibit 15). Beryllium is also a lightweight metal in comparison with other metals of similar

2

Exhibit 2  page 2 of 8

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

strength, such as tungsten, which is the world's heaviest metal. *See id.* Beryllium is an extremely heat-resistant metal, with a melting temperature of approximately 2349° F. Other comparable lightweight metals cannot withstand such high temperatures. For example, aluminum has a melting point of only 1220.58° F and is more susceptible than beryllium to expansion and contraction in extreme heat and cold.

8.      Beryllium's properties make it highly suitable for use in applications such as nuclear missiles, satellites, jet fighters, and nuclear reactors because such equipment requires lightweight materials that can withstand extreme conditions and can last over time. Loral's internal publication, Spectrum, details LABC's precision capability that permitted it to acquire projects involving these applications. (*See* Exhibit 16). After experimenting with other metals that existed in larger supplies in the United States and that were cheaper and easier to mine (such as aluminum), the United States government contracted or subcontracted with beryllium companies, including LABC, to precision machine beryllium into various component parts on behalf of the United States government to be used in, among other things: the triggers in nuclear warheads, the guidance systems in missiles, reflectors in nuclear reactors, the targeting pods and guidance systems of jet fighters for the United States Navy and Air Force, and the guiding and landing systems of satellites and the lunar landing module for the National Aeronautics and Space Administration ("NASA"). (*See* Exhibit 16).

9.      In the early 1960's, Loral Corp. acquired ABC located in Sarasota Florida, and renamed the company the Loral American Beryllium Company. Over time, LABC took on tasks other than the machining of beryllium, but machining beryllium component parts remained its focus, and 98 to 99% of its beryllium work was for the United States government.

Exhibit 2  page 3 of 8

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

3

10.     During the latter half of the 20th Century, there was only one major producer of beryllium material, Brush Wellman, and two major beryllium precision machining companies in the United States – Speedring and LABC.

11.     LABC supplied beryllium parts for a wide range of United States government applications, including the government's nuclear missile programs.  LABC machined most of the beryllium component parts (made out of almost pure beryllium) essential for the proper functioning of the guidance systems of the Minuteman and MX Peacekeeper nuclear missiles for the United States Air Force and the Poseidon, Trident, and Polaris (submarine launched) nuclear missiles for the United States Navy.  (*See, e.g.*, LABC-Bendix Minuteman Missile contract, attached as Exhibit 17).

12.     LABC also supplied the beryllium component parts for use in the LANTIRN targeting pod system for the United States Air Force's F-16 Fighting Falcon Jet Fighter.  (*See* Exhibit 16).

13.     LABC also built the beryllium component parts, designed and specified by the federal government, for use in several of the federal government's nuclear test reactors, including (i) one located at EG&G, a government-supervised design and testing facility in Idaho; (ii) the HFIR (High Flux Isotope Reactor) at the government-supervised Oak Ridge National Laboratory, in Tennessee; and (iii) Sandia, a Department of Energy facility in Albuquerque, New Mexico.

14.     The United States government used these reactors to: (i) test and maximize the efficiency and safety of nuclear energy; (ii) to conduct experiments testing the effectiveness of materials used to contain the reactor's radiation; and (iii) to test the effect that radiation had

Exhibit 2  page 4 of 8

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

4

on different substances, such as the cloth used to make protective gear or the material used on submarines.

15.    Beryllium was necessary for the proper functioning of these reactors because not only could it withstand the intense heat and radiation generated by the reactors, but beryllium also allowed for the maximum reflection of neutrons within the reactor, a process essential for the reactor to properly function. (*See* The Oak Ridge National Laboratory Review, attached as Exhibit 18).

16.    Additionally, LABC supplied beryllium parts, designed and specified by the federal government, for the atomic weapons being assembled at the Department of Energy's (DOE) Rocky Flats Site near Bolder, Colorado. (*See* Rockwell-LABC purchase order and letter, attached as Exhibits 19 & 20 respectively). The DOE was building nuclear core components ("pits") and triggers for atomic weapons. On behalf of the government, LABC built the Beryllium "pit liners" that acted as a neutron reflector within the bomb's nuclear core. Beryllium was used because it was essential to causing a thermonuclear reaction.

17.    In addition to its work for the military, LABC built beryllium component parts for the United States government's aerospace programs. (*See* ITT-LABC contract for construction of a scanner housing for use in space, attached as Exhibit 21). LABC supplied the beryllium parts for use in NASA's Geostationary (GOES) weather satellite and Thematic Mapping satellite. LABC also built the beryllium parts for the guidance and landing systems for NASA's Lunar Landing Module (LEM).

18.    Because of the highly sensitive and often classified nature of the projects for which LABC supplied beryllium component parts, United States government officials were extensively involved. The designs for the above work were generated by government run or

Exhibit 2  page 5 of 8

5    Plaintiff's Response opposing Defendant's Motion for Summary Judgment

supervised entities, such as the Charles Draper Laboratory in Cambridge, Massachusetts, the Los Alamos Laboratory in New Mexico and the Lawrence Livermore National Laboratory in California.

19.     In the 1980's, the United States government also required and funded LABC's construction of a separate facility on the grounds of the LABC Tallevast site. This new facility was used exclusively for highly classified "Q Work" performed by LABC on behalf of the United States government and finished component parts were removed from the Site under tight security.

20.     LABC performed Q Work on behalf of, *inter alia,* the United States Department of Energy (DOE). (*See, e.g.,* Letter from Rockwell/Rocky Flats to DOE detailing the quality plan and source inspection of LABC's facility, Exhibit 22). The Q Work contracts included the above-mentioned machining of beryllium component parts used in nuclear bombs constructed for the government at Rocky Flats. (*See* Exhibits 19 & 23).

21.     The United States government frequently inspected LABC's facilities, including the Q Work building, and the DOE was particularly involved with LABC's work on its nuclear programs. The DOE inspected LABC's facility and parts produced for its classified work on nuclear bombs. (*See* Exhibits 22 & 24). Other government agencies, including the Department of Defense ("DOD"), and the United States Air Force also inspected LABC's beryllium parts to ensure compliance with the government designs. (*See, e.g.,* Rockwell International correspondence discussing inspection, handling, and cleaning issues regarding beryllium parts being made for classified government work at the LABC facility, attached as Exhibits 22, 24 - 26). For example, the contract between Northrop and LABC mandated that "government

| Exhibit 2  page 6 of 8 |
| Plaintiff's Response opposing Defendant's Motion for Summary Judgment |

inspection is required prior to shipment of materials from [LABC's] plant." (*See* Exhibit 27 at bates no. 568, IV "Inspection, Acceptance, & Destination.").

22.    Additionally, these government agencies inspected the parts for contamination and surface impurities to ensure that they had been properly cleaned. Other government agencies, including the Occupational Safety and Health Agency and the Environmental Protection Agency, also periodically inspected LABC's entire facility for its cleanliness and safety.

23.    As a result of these inspections, the United States government was aware of LABC's use, storage, and disposal of beryllium, and the chlorinated solvents it used to degrease beryllium parts. The government was also well aware of risks that were associated with beryllium exposure, as indicated by the beryllium warning label at the top of the "Shop Traveler," attached as Exhibit 28.

24.    The United States government had the authority to object to LABC's practices, if it chose to do so. To my recollection, the government never criticized LABC for the materials it used in its machining, degreasing and treating of beryllium parts. Neither did the government criticize LABC for its handling, storage, or disposal of those materials. In fact, because of LABC's state of the art cleaning system and stringent quality control policies, not only did the government approve of LABC's methods, but I also recall that various government agencies commended LABC on a number of occasions for its exemplary work in the beryllium industry.

> Exhibit 2  page 7 of 8
>
> Plaintiff's Response opposing Defendant's Motion for Summary Judgment

7

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _12/1/05_

George M. Allen Jr.

Exhibit 2  page 8 of 8

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

8

EEOICPA BULLETIN NO.03-27

Issue Date:  May 28, 2003

Exhibit 3  page 1 of 12

Plaintiff's Response opposing Defendant's
Motion for Summary Judgment

Effective Date:  May 28, 2003

Expiration Date:  May 29, 2004

Subject: Establishing covered subcontractor employment.

Background:  The Energy Employees Occupational Illness
Compensation Program Act (EEOICPA) extends coverage to
subcontractors who have been employed by the Department of
Energy (DOE) or a beryllium vendor to perform services at
certain covered facilities. Subcontractors of Atomic Weapons
Employers are not eligible per 42 U.S.C. §73841 (3). In
addition, subcontractor employees who were employed by a DOE
facility or beryllium vendor performing activities related to
construction and or maintenance are covered employees as defined
by section 73841 (B)(11) of EEOICPA and are not limited to the
criteria defined under duty station.

For the purposes of this program, the following definitions will
apply:

**Contractor** – An entity engaged in a contractual business
arrangement with the Department of Energy to provide services,
produce materials or manage operations at a beryllium vendor or
Department of Energy facility.

**Subcontractor** – An entity engaged in a contracted business
arrangement with a beryllium vendor contractor or a contractor
of the Department of Energy to provide a service at a beryllium
vendor or Department of Energy facility.

**Service** – In order for an individual working for a subcontractor
to be determined to have performed a "service" at a covered
facility, the individual must have performed work or labor for
the benefit of another within the boundaries of a DOE or
beryllium vendor facility. Example of workers providing such

services would be janitors, construction and maintenance workers.

**Delivery of Goods**– The delivery and loading or unloading of goods alone is not a service and is not covered for any occupation, including workers involved in the delivery and loading or unloading of goods for construction and or maintenance activities.

**Duty Station** – The physical site where a subcontractor employee reports or reported to work at a DOE or beryllium vendor facility. Construction and maintenance workers are deemed to report directly to a DOE facility or Beryllium vendor in instances where they reported to a union hall or a construction or maintenance contracting site and were "dispatched" to a DOE or beryllium vendor facility. Other service contract employees are required to have reported to work at a DOE facility or beryllium vendor.

**Contract** – An agreement to perform a service in exchange for compensation, usually memorialized by a memorandum of understanding, a cooperative agreement, an actual written contract, or any form of written or implied agreement, is considered a contract for the purpose of determining whether an entity is a "DOE contractor."

Establishing covered employment for subcontractor employees under the EEOICPA may be complex. The potential exists for hundreds of subcontractor employees to have been engaged, at various times, in employment related activities at DOE and beryllium vendor facilities. In most instances, personnel records pertaining to subcontractors are difficult to locate. Records that do exist, such as security logs or health records are often insufficient to reliably verify employment for a particular employee. As a consequence, the CE must sometimes use affidavits and other types of evidence that have varying degrees of probative value in determining the factual basis of a claim. Given the complexity of establishing covered employment for subcontractor employment, detailed procedural guidance is required.

Reference: 42 U.S.C. § 7384l(7), 42 U.S.C. § 7384l(11)

Purpose: To provide guidance on establishing covered employment for subcontractor employees.

Applicability: All staff.

Exhibit 3   page 2 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

Actions:

1.  Upon the initial review of a <u>non-RECA</u> primary claim, the CE must ensure two criteria are met.  First, the CE is to decide whether the claimed condition on the EE-1 or EE-2, is appropriate for the type of employment facility where employment is alleged to have occurred.  For example, a claim for beryllium sensitivity or chronic beryllium disease must indicate employment for a beryllium vendor or a DOE facility where beryllium was present; chronic silicosis must indicate employment mining tunnels at DOE facilities in Nevada or Alaska; or cancer must indicate employment at a DOE facility or atomic weapons employer.  Second, if a covered condition has been claimed, the medical documentation must substantiate the presence of cancer, beryllium illness, or silicosis (EEOICPA PM 2-400). If the evidence of record does not satisfy either of these initial elements, the CE must request such evidence from the claimant.  After appropriate development, the CE is to determine whether or not the evidence is sufficient to proceed with additional development or that the claim is to be denied for failure to establish a covered condition.

2.  After it is determined that a covered medical condition has been claimed, the CE is to review the employment history provided on the EE-3(Employment History Form)or other pertinent employment documentation provided by the claimant.  The first item that the CE must discern is the name of the employer. An employer can be an individual or a private business that hired the employee to perform a service in exchange for a wage.   In order for a subcontractor employee to be determined to have performed work or labor for DOE or a beryllium vendor, the individual must have performed a "service" for the benefit of the DOE or beryllium vendor within the boundaries of the facility.  For all such employees, mere delivery of goods alone, including the loading or unloading of goods, is insufficient to establish that a service was performed for the benefit of DOE or beryllium vendor.  For all such employees, the employee must establish that his/her duty station is/was on the premise of the DOE or beryllium vendor facility.  Construction or maintenance workers who initially report to a union hall or construction or maintenance facility but are then "dispatched" to a DOE or beryllium vendor facility to perform these types of services are deemed to have a duty station at the DOE or beryllium vendor facility.  Examples of jobs associated with construction and maintenance include:  asbestos workers, boiler workers, bricklayers, carpenters, electrical workers, elevator constructors, iron workers, laborers, operating engineers,

| Exhibit 3   page 3 of 12 |
| --- |
| Plaintiff's Response opposing Defendant's Motion for Summary Judgment |

plasterers and cement masons, painters, roofers, sheet metal workers, plumbers, construction workers, and pipe fitters.

3.  Once the CE has reviewed all employment documentation initially submitted by the claimant, he or she must compare the claimed work history against the web-based list of covered facilities provided by the Department of Energy as per established procedures.

Subcontractors will not appear on the web based DOE list of covered facilities.  Only major contractors are listed under each facility.  The web based list contains the name of the facility, the facility type, dates and a brief historical summary of the facility which should be utilized by the CE throughout the development of employment.

4.  If the CE compares the work history provided by the claimant with the list of covered facilities and is unable to locate the claimed facility, the CE prepares a letter to the claimant.  The letter advises the claimant that he/she has not identified employment that would qualify for coverage under the EEOICPA. The letter instructs the claimant to provide clarification or evidence within 30 days as to whether or not employment occurred at one of the covered facilities. If after thirty days no response or evidence is received to identify employment at a covered facility, the CE may prepare a recommended decision denying coverage due to the fact that employment at a covered facility has not been identified.

5.  Once the CE has determined that the claimant identified employment with a subcontractor performing covered services at a DOE or beryllium vendor facility during a covered time period, the CE must determine the relationship between the employer and the facility where the employment was claimed.  The CE reviews the name of the DOE facility claimed; the city, state or any other description of where the employment activities took place (duty station); the name of the company the employee worked for; and the type of services performed.  The CE will also consider the employee's position title to determine the type of services performed. Based on this information, the CE will often be able to infer the relationship.

An example of direct employment for a Be vendor (a DOE contractor) is employment for Brush Wellman in Elmore, Ohio. Alternatively, if a claimant states that he/she worked for ABC Electric Company at the Brush Wellman facility in Elmore, Ohio, the CE is to proceed with an initial finding that the claimant

Exhibit 3  page 4 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

is identifying subcontractor employment, hired by ABC Electric Company to perform work or labor at a covered Be vendor facility. An example of direct DOE employment would be if the claimant identified employment at the Portsmouth Gaseous Diffusion Plant (GDP) in Piketon, OH, working for Goodyear Atomic Corporation, an established contractor at the Portsmouth GDP. However, if the claimant stated he/she was hired by Grinnel Corporation to perform work for the Goodyear Atomic Corporation, the CE would find that the claimant is identifying subcontractor employment by an independent contractor (Grinnel Corporation) hired to perform work or labor at a covered facility.

**Caution:** The CE must be careful to note that in some instances, a specific employer may serve as a contractor at one facility, and a subcontractor at another. Moreover, the CE should be aware that different names can sometimes refer to the same facility e.g. Berylco-Beryllium Corporation of America. Therefore, evidence must be thoroughly evaluated to determine whether the employee may have worked as a subcontractor at a DOE or beryllium vendor facility.

If the employee claims employment for a subcontractor, including construction and or maintenance, at a DOE facility or beryllium vendor and the CE identifies the contractor as a <u>possible</u> subcontractor, the code "S" (subcontractor) must be entered in the "Employment Classification" screen in ECMS indicating a subcontractor has been potentially identified per EEOICPA Bulletin 03-05. If the relationship is unclear to the CE further development of the situation is necessary.

If the employee has claimed subcontractor employment during a period that the facility was designated an AWE, the CE is to prepare a letter to the claimant advising him or her that such employment is not covered under the Act. The CE is to reference 42 U.S.C. §73841 (3) and state that this section of the EEOICPA only extends coverage to <u>direct</u> employees of an AWE. For example, if a claimant states that the employee worked for XYZ Company at Simonds Saw & Steel, in Lockport, NY, the CE must make an initial finding the claimant is identifying employment that is not covered under the EEOICPA.

The claimant must be granted 30 days to either demonstrate direct employment for the AWE or other employment that would qualify him/her for consideration under the EEOICPA. If after thirty days the claimant has not provided a response, or

Exhibit 3   page 5 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

produced a response that does not qualify him/her for further consideration, and has no other period of claimed employment that may qualify for benefits, the CE can proceed with a recommended denial of benefits on the grounds that there is no evidence of covered employment.

6.  If the CE determines that the claimant is alleging employment at a covered facility but determines that the claimant was not performing a "service" as defined above, the CE prepares a letter to the claimant.  The letter advises the claimant that he/she has not identified or submitted evidence that he/she performed a "service" for the benefit of the DOE as defined above.  An example of a service is the installation or maintenance of electrical lines.  However, the mere delivery of the material used to install the lines **would not** be a service. The claimant is to be provided 30 days to submit evidence that during his/her employment he/she performed a "service" for the benefit of the DOE.  If after 30 days no response or evidence is submitted to establish that the claimant performed a service, the CE prepares a recommended decision denying coverage due to the fact that the evidence did not establish that the employee performed a service under the EEOICPA.

7. There are three developmental components that must be met before a decision of covered employment can be reached.  The CE must determine whether **1)** the claimed period of employment occurred during a covered time frame as alleged, **2)** a contract to provide "covered services" existed between the claimed subcontractor and the DOE employer or Be vendor at a covered facility (during a covered time frame), and **3)** whether employment activities (work or labor) took place on the premises of the covered facility.

8.  The first developmental component in establishing covered subcontractor employment is to verify the claimed period of employment.  The CE is to verify employment with the DOE as outlined in EEOICPA PM 2-400.  The CE is to refer to EEOICPA Bulletin 02-34, "Procedures for using the on-line ORISE database," for any facility that is included in the ORISE database.

9. The CE is to complete the Employee Information section on Form EE-5, Employment Verification Sheet, with the employee name, SSN, employer name and DOE facility where the employment is alleged to have occurred.  The CE forwards Form EE-5, the DOE cover letter and copies of Forms EE-1 or EE-2 and Form EE-3 (or

Exhibit 3   page 6 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

other employment evidence) to the appropriate DOE point of contact (POC) or the appropriate corporate verifier.

The DOE should complete Form EE-5 by verifying the claimed employment, to include the dates and location of employment activities and whether the employee was a DOE employee, contractor or subcontractor.  The DOE should supply copies of any records pertaining to the employee such as, a security clearance record, security logs, health records or dose records that would assist the DOL in verifying employment, verifying a contractual relationship, or respond that no evidence exists. Any primary records connected to radiation dose monitoring should not be submitted (these will be requested by NIOSH at a later date if a non-SEC cancer is established), but the DOE should be asked to summarize the information reported in such records, i.e., the complete monitoring history dates will assist in determining covered SEC employment for 250 days and whether a contract existed between the employer and the DOE.

10.  At the same time as the development of employment with the DOE, the CE will prepare an initial development letter to the claimant and request a signed Form SSA-581 and any other employment information that would establish covered subcontractor employment.

The letter outlines the types of evidence that could establish covered employment including affidavits, pay stubs, tax records, union documentation, pension records and copies of contracts if available.  The CE will not ask the claimant to provide a copy of the original contract.  The CE will provide the claimant with Form SSA-581 and instructions for its completion.  The CE advises the claimant that in the absence of alternative employment evidence, the DOL will request SSA records on receipt of the signed form.  The CE provides the claimant with 30 days to provide a response and a signed Form SSA-581.

11.  Once a response is received from the DOE, the CE is to review the evidence to determine if it is sufficient to establish the components of covered employment. If the DOE or corporate verifier has reported on the EE-5 that the claimed period of employment is completely accurate, the CE can find that 1) employment has been verified, 2) that a contract existed between the subcontractor and the DOE employer and 3) that the employment activities took place on the premises of the covered facility.  If the DOE was unable to verify employment as alleged, the CE will need to review Form EE-5 and any other information provided by the DOE.  It may be that the DOE is able

Exhibit 3   page 7 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

to provide evidence substantiating one or two of the required
covered employment components, but not all.  For example, the
DOE may not have sufficient evidence to verify the claimed dates
of employment, but they do know that the claimed employer
(subcontractor) did have a contract to provide services at a
covered facility during a specified time frame.  In any event,
if the DOE is unable to verify employment, the CE is to continue
to develop employment to meet the three requirements of covered
subcontractor employment as indicated.  The CE must enter Code
**ER** or **CR** as appropriate in the claims status history screen in
ECMS with the effective date as the date received in the DO for
any claim in which the DOE provided a complete response, a
response in which they provided all available information, or
when they have no employment records (EEOICPA Bulletin 03-07).

12. On receipt of a claimant's response to the initial
development letter, which should include a signed SSA-581, the
CE is to review any documentation submitted to determine if the
evidence submitted proves that the employee worked for the
claimed employer.  The CE has the discretion to determine
whether the evidence is sufficient to prove employment without
information from the SSA (the claimant may have submitted Forms
W-2 or other tax related documents).  However, the existing
evidence must be of sufficient quality to convince the CE that
the claim of the employee is accurate.  <u>In the recommended
decision, the CE must include a complete and thorough discussion
of the rationale and evidence upon which the conclusions are
based.</u>  Outside of verification by the DOE or a corporate
verifier, a single source of evidence affirming the period of
claimed employment is generally not sufficient.  It will take
multiple pieces of collaborative documentation to reliably
establish the accuracy of claimed employment.  Moreover, should
the CE decide that the SSA employment verification is
unnecessary to prove the employment occurred as alleged, he or
she must continue to develop the two remaining components of
covered subcontractor employment, i.e., evidence of a
contractual relationship and that the employee worked on the
premises of a covered facility.

If the CE decides that the evidence proves the claim of
employment without the SSA records, it must also be true that
the SSA records will not assist in a determination concerning
the existence of a contract or the presence of the employee on
the premises of the covered facility.

However, if the CE reviews the information from the claimant and
is not convinced that it is sufficient to verify employment, the

Exhibit 3   page 8 of 12

Plaintiff's Response opposing Defendant's
Motion for Summary Judgment

SSA-581 claims package should immediately be referred to the National Office.

13.   After the SSA responds to the request for employment evidence, the CE will need to review the information in conjunction with the other evidence in the case.  The CE must determine whether the first component of covered employment, proving that the employee worked for the employer as alleged, is substantiated. On receipt of SSA records requested by the NO the CE enters the **SR** code with the effective date the response is received in the office regardless of whether the information addresses all, part, or one of the employment periods (EEOICPA Bulletin 02-14).

14.   For more detailed specifics regarding the verification of employment for a DOE facility and or beryllium vendor, the CE should refer to EEOICPA Bulletin 02-02.

15.   It is not necessary to prove beyond a reasonable doubt the accuracy of the alleged period of employment.  Rather, the evidence must be of such a convincing quality to assure the adjudicator of the reasonableness of the claim.  The CE has the discretion to assign probative value to certain forms of evidence.  For example, the CE may find that an affidavit from a former CEO of the employer has significantly more probative value than that of one from a relative who may benefit from any award granted.  The CE must use his or her own judgment to ascertain whether the evidence taken as a whole is sufficient to verify employment. In most instances, it will be the totality of multiple separate pieces of different evidence that prove that the employee worked for the employer as alleged. A single affidavit affirming the claimed period of employment at a covered facility will generally not suffice.  On the other hand, for example, if the CE obtains an affidavit from a co-worker in conjunction with notes from the work site nurse indicating visits for check-ups, a stronger case can be made affirming the claim of employment.

16.   If the CE determines that the evidence does not establish the claimed period of employment, the CE is to issue a recommended decision to deny based on lack of evidence to establish covered employment at a DOE facility.

17.   If the CE concludes that the evidence is sufficient to verify the claimed dates of covered employment, it is then necessary to determine the existence of a contractual connection between the employee's primary employer and the covered

Exhibit 3  page 9 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

beryllium vendor or DOE facility. This is the <u>second component</u> of covered contractual employment. The evidence must establish that a contractual relationship existed, that it existed during a covered time frame for the facility, and that the contract was for services that constitute covered services.

To establish this component of covered employment, it is not necessary for the claimant, the Department of Energy or another entity to provide the actual contract or subcontract for the CE to affirm the existence of covered employment (although if available it would assist in establishing a contractual relationship). It is the totality of all the evidence received that will determine whether a contract or subcontract did exist.

For example, if the claimant is alleging that he/she worked as an electrician installing and/or repairing electrical lines for ABC Electric at the Medina Facility in Texas during a covered time frame, the SSA has confirmed employment for that same period, and the Electrician Local Union provided a statement on union letterhead that states they contracted with ABC Electric Co. to perform work at the Medina Facility during the covered time period, the CE can proceed with a finding that the employee performed a covered service at a covered facility during a covered time period for a DOE subcontractor employer.

Another example would be if the claimant is alleging he/she worked as a construction laborer for Grinnel at the Portsmouth GDP in Piketon, OH and the DOE provided a Personnel Clearance Master Card (security clearance record) indicating the employee's name and job title, the name of the DOE facility, the company requesting security clearance (Grinnel), and the dates clearance was requested and/or granted, the CE can proceed with a finding that the Grinnel had a contract with Portsmouth GDP as a subcontractor. A Personnel Clearance Master Card is evidence that security clearance was requested by the subcontractor for the employee to perform work at the DOE facility and is sufficient to establish evidence of a contractual relationship (20 CFR 30.206(d)(1)). **However, it is not sufficient, in and of itself, to establish that the individual employee was present on site at the facility.**

18. If the CE determines that the evidence does not establish that a contractual relationship existed between the claimed employer and the DOE facility, the CE issues a recommended decision to deny based on lack of evidence to establish a contractual relationship (component 2).

Exhibit 3   page 10 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

19. Should the evidence substantiate that a contract or subcontract existed during a covered time period, the CE must then make a finding concerning the employee's duty station and the type of work performed. The employee must have performed a service on the premise of the facility. With the exception of construction and maintenance workers, the employee must also have reported to work at the facility (duty station must have been at the facility).

Construction and maintenance workers are determined to have a duty station at the covered facility if they performed construction or maintenance on the premise.

20. The premise of a covered facility is defined differently according to its classification under the statute.

**42 U.S.C. 73841 (12)** defines a DOE facility as any building, structure, or premise, including the grounds upon which such building structure, or premise is located (A) in which operations are, or have been, conducted by, or on behalf of, the DOE (except for buildings, structures, premises, grounds or operations covered by Executive Order No. 12344, dated 2/1/82 pertaining to the Naval Nuclear Propulsion Program); and (B) with regard to which the DOE has or had (i) a proprietary interest; or(ii) entered into a contract with an entity to provide management and operation, management and integration, environmental remediation services, construction, or maintenance services.

**42 U.S.C. 7384n(a)** provides that a covered beryllium employee shall, in the absence of substantial evidence to the contrary, be determined to have been exposed to beryllium in the performance of duty for the purpose of the compensation program if, and only if, the covered beryllium employee was 1) employed at a DOE facility; or 2) present at a DOE facility or a facility owned and operated by a beryllium vendor, because of employment by the United States, a beryllium vendor, or a contractor or subcontractor of the DOE; during a period when beryllium dust, particles, or vapor may have been present at such facility.

In making a finding regarding the presence of the employee on the premise of the covered facility, the ideal form of the evidence will be security logs, health records or a summary of the radiation dose monitoring. Security logs are defined as signature logs that provide the employees name and dates of entry or exit at the DOE facility. They are different from security clearance records in that they provide evidence of

Exhibit 3   page 11 of 12

Plaintiff's Response opposing Defendant's Motion for Summary Judgment

entry onto the premises of the facility, whereas the security
clearance documents just provide evidence that security
clearance was requested but does not establish presence on the
facility.

In many instances the CE will be required to utilize affidavits
(Form EE-4 or other form of affidavit). It will be left to the
judgment of the CE to determine whether the evidence of file is
sufficient to establish the presence of the employee on the
premises of the covered facility. As a general rule, a single
affidavit from a spouse or family member without other
collaborative documentation is insufficient to make a reasonable
finding of fact. However, an affidavit from a co-worker is of
much greater value. Other examples of documentation are punch
cards, time and attendance forms, minutes from employment
related meeting(s) that list the claimant in attendance and
written correspondence from the employer.

21. If the CE can verify that the employee worked for a
subcontractor during a covered time frame **on the premises** of a
designated DOE or beryllium vendor facility, a finding can be
made for covered employment. In the case of a subcontractor
employee not involved with construction or maintenance, the CE
must also find that the employee's duty station was at the
facility. The CE may then proceed with the normal adjudication
of any outstanding issues regarding the claim.

22. If the CE cannot verify the employee's presence on the
premises of a designated DOE or beryllium vendor facility, and
cannot verify the duty station if necessary, the CE issues a
recommended decision to deny based on lack of evidence to place
the claimant on site at the covered facility.

Disposition: Retain until incorporated in the Federal (EEOICPA)
Procedure Manual.

| Exhibit 3   page 12 of 12 |
| Plaintiff's Response opposing Defendant's Motion for Summary Judgment |

PETER M. TURCIC

Director, Division of Energy Employees

Occupational Illness Compensation

Distribution List No. 1: Claims Examiners, Supervisory Claims Examiners, Technical Assistants,
Customer Service Representatives, Fiscal Officers, FAB District Managers, Operation Chiefs,
District Directors, Hearing Representatives, District Office Mail & File Sections